IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

NATHAN J. FRIAR,

                       Petitioner,

v.

LANCE WIERSMA,

                       Respondent.

OPINION and ORDER

21-cv-725-jdp

---

Petitioner Nathan J. Friar, who's represented by Cole Daniel Ruby, seeks relief under 28 U.S.C. § 2254 following his conviction for second-degree sexual assault with the use of force in Dane County Case No. 2016CF1268. Friar raises three claims of ineffective assistance of trial counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), which respondent contends are meritless. I will deny the petition because I agree that Friar's claims fail on the merits. But I will grant a certificate of appealability because reasonable jurists could debate the merit of Friar's *Strickland* claims.

BACKGROUND

This background is mostly drawn from the decision of the state court of appeals affirming Friar's conviction and the circuit court's denial of his postconviction motion. *See State v. Friar*, 2020 WI App 76 (table). On June 5, 2016, at 4:30 a.m., a 21-year-old woman woke up in Friar's apartment in downtown Madison. *Id.* ¶ 4. I will refer to this woman as "M." M texted friends, "OMG, please help" and "Hi. Help, please. I mean it. Call me back ASAP. I hate Friar's apartment building with all of me and everyone associated with it." *Id.* (alteration adopted). Later that morning, M called the City of Madison Police Department, and Officer

Michael Franklin took an initial report in which he documented M's assertions that: (1) Friar had grabbed her by the neck and pushed her onto the bed and held her down; (2) she had started to black out the incident because she did not want to have sex with him; and (3) she had pain in her genitals but didn't know whether sexual activity had occurred. *Id.*

Franklin escorted M to the hospital for a forensic exam. *Id.* Physician's Assistant Maureen Hall, an examiner for the Sexual Assault Nurse Examiner (SANE) program, administered a six-hour forensic exam. *Id.* ¶ 5. Hall documented abrasions to M's external genitalia and bruising to her neck, right shoulder, collarbone, upper chest, and lower back. *Id.* Hall completed a sexual assault report in which she documented M's statement that she had been "held down all over," strangled, and couldn't remember everything because "[she] blacked out when [she] couldn't breathe." *Id.* M told Hall that Friar's penis and fingers contacted her external genitals and that his fingers entered her vagina, but that she was unsure whether sexual intercourse or oral sex occurred. *Id.* Hall also documented that M was a type 1 diabetic and had consumed alcohol that evening. *Id.*

The state charged Friar with two offenses: (1) second-degree sexual assault with the use of force; and (2) strangulation and suffocation. *Id.* ¶ 8. Friar was represented by George Brian Brophy at trial. At trial, M testified as follows regarding her encounter with Friar. M met up with Friar at a bar in downtown Madison and spent the evening talking, dancing, and making out with him. *Id.* ¶ 9. Friar invited M to his apartment for an after-party and, after the two talked and made out in front of his apartment building, she accepted the invitation. *Id.* Once inside, M realized that there was no after-party. *Id.* Friar pulled M into his bedroom, where his demeanor changed and the making out became forceful and uncomfortable. *Id.* Friar pushed M onto the bed and removed her clothes as she said "no" and "stop, slow down, be gentle." *Id.*

2

Friar held down one of M's shoulders with one hand while his other hand squeezed her throat and stopped her from breathing. *Id.* While Friar squeezed M's neck, he inserted his other hand forcefully into her vagina. M's mind eventually went blank and she lost all memory. *Id.* Sometime later M opened her eyes and Friar was passed out on top of her. M's vagina hurt and she observed blood when she urinated. *Id.* M also testified that: (1) neither her alcohol consumption nor its interaction with her diabetes clouded her memory or judgment; and (2) her memories of the evening were clear until she blacked out. *Id.* I will discuss other evidence presented by the state as it becomes material to the analysis.

Friar testified and denied strangling or sexually assaulting M. *Id.* ¶ 11. Brophy argued to the jury that: (1) the encounter in the apartment unit was consensual; (2) the bruises on M's neck were caused by consensual hickeys and not strangulation; (3) M's memory was clouded by the interaction of alcohol and her diabetes; and (4) the state had presented evidence of a mere "bad date." *Id.* ¶¶ 12, 84.

The jury found Friar guilty of second-degree sexual assault with the use of force and not guilty of strangulation. *Id.* ¶ 13. Represented by his current counsel, Ruby, Friar moved for postconviction relief, contending that the circuit court erroneously admitted certain evidence and that Brophy provided ineffective assistance. *Id.* Brophy and Dr. Richard Tovar testified at the hearing on Friar's postconviction motion. Dkt. 6-16. Friar presented Dr. Tovar's testimony to support one of his claims of ineffective assistance against Brophy. The circuit court issued a written order denying Friar's postconviction motion. Dkt. 13-3.

Friar appealed. Friar contended, among other things, that: Brophy provided ineffective assistance by not: (1) objecting to testimony by SANE nurse Hall repeating M's narrative of the encounter; (2) impeaching M with her prior inconsistent statements about the incident;

3

and (3) presenting expert testimony on the effects of alcohol consumption on a person with type 1 diabetes. *Friar*, 2020 WI App 76, ¶ 1. The state court of appeals rejected these arguments and affirmed. *See id.* ¶¶ 2, 88. The state supreme court summarily denied review. Dkt. 6-8.

ANALYSIS

A. **Legal standards**

Federal courts may grant habeas relief only if the state court's denial of relief "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1)–(2). A state court's adjudication is "contrary to" clearly established Supreme Court precedent if the court either: (1) reaches a conclusion on a question of law opposite to that reached by the Supreme Court; or (2) decides a case differently than the Supreme Court has on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under § 2254(d)(1)'s "unreasonable application" clause, courts may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the case. *Id.* at 413. For the application to be unreasonable, a state prisoner "must show that the state court's decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam). Similarly, for a state court's factual finding to be unreasonable, there must be no possibility of reasonable agreement with the finding. *See Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015); *Wood v. Allen*, 558 U.S. 290, 301–02 (2010).

When applying § 2254(d), courts look to "the last reasoned state-court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *See Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc); *see also Wilson v. Sellers,* 584 U.S. 122, 125 (2018). Review under § 2254(d) is limited to the state-court record. *See Shoop v. Twyford*, 596 U.S. 811, 819 (2022); *Dunn v. Neal*, 44 F.4th 696, 702 (7th Cir. 2022). The petitioner bears the burden to show an error under § 2254(d), and the burden of proof under § 2254 generally. *See Westray v. Brookhart*, 36 F.4th 737, 746 (7th Cir. 2022); *Quintana v. Chandler*, 723 F.3d 849, 854 (7th Cir. 2013).

Claims of ineffective assistance of counsel are governed by the two-part test in *Strickland*. To establish that counsel provided ineffective assistance, Friar must show that Brophy's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. at 687. To prove deficient performance, Friar must show that Brophy's performance "fell below an objective standard of reasonableness" as measured by prevailing professional norms. *Id.* at 688. Courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To prove prejudice, Friar must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

It is "all the more difficult" to prevail on a *Strickland* claim under § 2254(d). *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Because the standards that *Strickland* and § 2254(d) create are both "highly deferential," review is "doubly" so when the two apply in tandem. *Id.* The question is not whether counsel's actions were reasonable, but rather, "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

**B. The state court's application of the standards**

    **1. Claim 1**

Friar contends that Brophy provided ineffective assistance because he failed to object to Hall's testimony. Dkt. 16 at 20. Friar explains that Brophy should have objected to Hall's reading of M's narrative in the SANE report because it contained prior statements by M that were consistent with her trial testimony, and those statements were inadmissible hearsay. *See id.* at 20–21. Friar also contends that Brophy provided ineffective assistance by failing to object to the prosecutor's later line-by-line review of M's narrative as cumulative. *Id.* at 22. Friar contends that if Brophy had raised these objections, the circuit court would have deemed this part of Hall's testimony inadmissible. *Id.*

The state court of appeals rejected this claim. *Friar*, 2020 WI App 76, ¶¶ 62–63. The state court of appeals noted that Brophy testified at the postconviction motion hearing that: (1) he did not expect an objection to be successful because the circuit court had overruled Friar's objections to the testimony of M's roommates (Allyson Reeves and Paige Hampton) about M's related prior consistent statements; and (2) he believed that allowing Hall to read M's one-paragraph narrative without interruption would allow him to get past that part of her testimony and "focus the jury's attention on the points that [he] wanted to hit with her." *See id.* ¶ 62.

The state court of appeals concluded that Brophy's strategy was reasonable. *Id.* ¶ 63. The state court of appeals explained that Brophy based his strategy on his: (1) observation of the circuit court's related evidentiary rulings; and (2) beliefs about how to minimize the impact of Hall's testimony on the jury and to focus its attention on other points like the inconsistencies between M's statements and Hall's observations. *See id.* The state court of appeals further

6

concluded that Brophy's strategy "applied equally to Hall's reading of the narrative statement and to the prosecutor's questioning of Hall that followed regarding the statement." *Id.*

Brophy's strategy was at least arguably reasonable under *Strickland*. The circuit court admitted M's roommates' testimony about M's prior consistent statements, so Brophy had good reason to believe that an objection presenting the same basic issue was "doomed to fail." *See Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009); *see also Mey v. Richardson*, No. 15-cv-740-jdp, 2017 WL 1403320, at *5 (W.D. Wis. Apr. 19, 2017) ("Mey's attorney was not deficient for not objecting to this testimony because the objections would have been futile."). Friar contends that Brophy's failure to object to Hall's testimony was deficient because the state court of appeals concluded that M's roommates' testimony about M's prior consistent statements was inadmissible hearsay, which shows that an objection to Hall's testimony would have been legally sound. *See* Dkt. 16 at 20–21; *see also Friar*, 2020 WI App, ¶ 44–45 (concluding that the circuit court erred in admitting these statements but determining that the error was harmless). But a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. It was reasonable for Brophy to refrain from making the hearsay objection in view of the circuit court's related evidentiary rulings; he had no reason to think that it would have helped Friar's defense.

Friar contends that the state court of appeals misapplied the law because the Wisconsin case that it cited when rejecting claim 1 is distinguishable. Dkt. 16 at 21 (discussing *State v. Carter*, 2010 WI 40). But the state court of appeals cited *Carter* for the proposition that "an attorney is not deficient for failing to raise objections that would be futile." *Friar*,

7

2020 WI App 76, ¶ 63. That proposition is consistent with federal law, which is what matters under § 2254(d). *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("[Section 2254(d) does not require citation of our cases—indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." (emphasis in original)).

Friar contends that Brophy's belief that objecting to Hall's testimony would be futile doesn't apply to the prosecutor's line-by-line review of M's narrative. Dkt. 16 at 22. But the second part of Brophy's strategy was to get past that part of Hall's testimony and focus on the points that he wanted to make on cross-examination. Raising an objection could have drawn attention to that part of Hall's testimony, which potentially would have defeated Brophy's strategy of minimizing it. I take Friar to contend that the circuit court would have sustained an objection that the testimony was cumulative. *See* Dkt. 28 at 2–3. But nothing in the record shows that to be case. The circuit court would have enjoyed broad discretion to decide whether the prosecutor's further questioning of M about the narrative constituted the "needless presentation of cumulative evidence." *See* Wis. Stat. § 904.03; *State v. Gonzalez*, 2014 WI 124, ¶ 22. Friar contends that Brophy admitted that he lacked a strategic reason for not objecting to this further questioning as cumulative, Dkt. 28 at 3, but that's not quite true. Brophy testified that he couldn't remember whether he considered objecting on the ground that the further questioning was cumulative. Dkt. 6-16 at 52. Brophy then testified that he should have objected as he "Monday morning quarterback[ed] it." *Id.* But Brophy's "post-trial regret" for failing to raise that objection doesn't show that his performance was unreasonable, *Corral v. Foster*, 4 F.4th 576, 585 (7th Cir. 2021), much less that there's no reasonable argument that it satisfied *Strickland*. Claim 1 lacks merit.

8

## 2. Claim 2

Friar contends that Brophy provided ineffective assistance because he failed to impeach Reeves, Hampton, and Officer Franklin with prior inconsistent statements by M showing that she lacked any memory of sexual activity with Friar. *See* Dkt. 1 at 10. Friar explains that these prior inconsistent statements directly contradicted M's "graphic testimony describing memories of being forcefully digitally penetrated while simultaneously being strangled." *Id.*

Friar describes M's prior inconsistent statements as follows. Friar says that M told Franklin that she didn't remember if any sexual contact or sexual intercourse had occurred between her and Friar. *See* Dkt. 16 at 23, 25. Further, Friar says that M didn't initially tell Reeves that she had been sexually assaulted, and that Reeves came to that realization only when she learned that M had received a SANE examination. *Id.* at 25. Friar also says that M made statements to Hampton and Reeves "generally downplaying references to strangulation." *See id.* at 24. I will limit my analysis to these prior inconsistent statements. *See Stevens v. Smith*, No. 04-cv-985-slc, 2005 WL 2365294, at *3 (W.D. Wis. Sept. 26, 2005) (arguments not raised in an initial motion or supporting brief are forfeited).

Brophy testified that a part of his defense was to show that M was misreporting the encounter with Friar. *See* Dkt. 6-16 at 37. But Brophy testified that trying to show that M didn't remember a sexual assault by Friar "was a little bit dangerous, because the jury could have interpreted that to have been related to the strangulation and suffocation." *Id.* at 37–38. Brophy further testified that he "absolutely . . . had to . . . show the jury that [the] strangulation and suffocation never happened." *Id.* at 38.

Brophy also testified that he wanted limit his cross-examination of Reeves and Hampton. *Id.* Brophy said that he believed that Reeves and Hampton had been "poor witnesses

9

for the state," and that Friar was "winning" at that point in the trial. *Id.* at 38, 40. Brophy further opined that M had "come across poorly" as a witness. *Id.* at 40.

The state court of appeals rejected claim 2. *Friar*, 2020 WI App 76, ¶¶ 71–74. The state court of appeals noted Friar's concession that Brophy initially made a reasonable choice to refrain from questioning M about the prior inconsistent statements. *Id.* ¶ 71; Dkt. 16 at 23 n.3. But Friar noted, as he does here, that the circuit court admitted M's prior statements to Hampton and Reeves that were consistent with M's trial testimony. *Friar*, 2020 WI App 76, ¶ 71; Dkt. 16 at 24. This ruling, Friar contended, gave Brophy a "risk-free, possibly productive opportunity to cross-examine [M's roommates] about M's statements that she could not remember any sexual contact or intercourse." *Friar*, 2020 WI App 76, ¶ 71; *see also* Dkt. 16 at 24 (Friar's contending that, at that point, Brophy's concerns about highlighting M's allegations of strangulation and suffocation were "no longer valid").

The state court of appeals disagreed, determining that Brophy's rationale still existed "even if the roommates' statements might have made the topic somewhat more attractive to the defense." *Friar*, 2020 WI App 76, ¶ 71. The state court of appeals also determined that Friar's "focus on the parts of M's prior statements . . . that she did not know whether sexual contact or intercourse occurred disregard[ed] the parts of those statements in which she said that she had been sexually assaulted." *Id.* ¶ 72. Further, the state court of appeals determined that Brophy "did attempt to impeach the roommates with M's prior inconsistent statements about other details of the encounter." *Id.* ¶ 73. In addition, the state court of appeals determined that the Franklin testified that his report was incomplete for several reasons and wasn't his "best documentation." *Id.* ¶ 74.

It's arguably reasonable to conclude that Brophy's concern about linking M's lack of memory to her testimony that Friar strangled her and stopped her from breathing was present after the circuit court admitted M's prior consistent statements. That line of cross-examination could have refocused the jury's attention on that issue. That concern didn't disappear just because the admission of M's prior consistent statements might have made cross-examination about her lack of memory less risky. Furthermore, Brophy believed that he had effectively cross-examined M, that the roommates were poor witnesses, and that Friar was winning at that point in the trial. Faced with those circumstances, Brophy's decision to avoid a possibly counterproductive line of questioning was at least arguably reasonable. This is particularly true because, as the state court of appeals determined, some of the statements that M made shortly after the incident were consistent with her testimony, and Franklin's report was incomplete. Friar disagrees, contending that M's earliest statements after the encounter contradicted her testimony that she remembered it. *See* Dkt. 16 at 24. But Friar hasn't specifically identified M's material inconsistent statements or provided a timeline of them. Friar hasn't met his burden under § 2254(d) to show this determination was unreasonable. Claim 2 lacks merit.

3. **Claim 3**

Friar contends that Brophy provided ineffective assistance because he failed to present an expert witness on the effects of alcohol and diabetes on M's memory. Dkt. 16 at 27. I begin with a summary of Brophy's testimony on the topic at the postconviction motion hearing.

Brophy testified that he believed that alcohol could affect a person's blood glucose levels and memory, and that impeaching M about the effects of alcohol and diabetes on her memory was a "substrategy." Dkt. 6-16 at 55–56. Brophy chose not to consult with an expert on toxicology or endocrinology before trial based on his understanding that M's medical record

11

lacked "specific information as to what her specific blood glucose levels were that evening." *See id.* at 58. Brophy's strategy was to explore that topic with M because she's a nurse and has had diabetes since she was a child, and he didn't anticipate the possibility that she would give inaccurate medical testimony. *Id.* at 59. Shortly before trial, Brophy decided that he could question the SANE examiner on any medical inaccuracies in M's testimony. *See id.* at 60–61. Brophy didn't realize that he needed an expert until the state objected at trial to issues that he wanted to explore. *See id.* at 61. Brophy testified that he was "shocked" by some of the inaccuracies in M's testimony about diabetes and alcohol, and that he would have an "expert on board" if he could defend the case again. *Id.* at 65.

The state court of appeals rejected claim 3. *Friar*, 2020 WI App 76, ¶ 84. The state court of appeals concluded that Brophy "reasonably decided that calling an expert would be pointless in the absence of any information about M's glucose levels on the night in question." *Id.* ¶ 85. Similarly, the court of appeals concluded that the lack of that information would preclude any expert opinion "that could have any real weight in these circumstances." *Id.* ¶ 86. The state court of appeals also concluded that it was reasonable to expect that M would testify truthfully about her experiences with alcohol and that, if she didn't testify truthfully, "this might lessen her credibility with jurors who have at least some familiarity with the common disease of diabetes." *Id.*

Claim 3 doesn't warrant habeas relief. The postconviction court determined that, because M's blood sugar levels were unavailable, "an expert could not have formed an opinion on whether or how M's alcohol consumption and diabetes may or may not have interacted to compromise her memory." *Id.* ¶ 83. Friar disputes this determination, *see* Dkt. 16 at 36, but I cannot review the postconviction court's evidentiary determination. *See Estelle v. McGuire*,

12

502 U.S. 62, 67–68 (1991) (federal habeas courts don't "reexamine state-court determinations on state-law questions"); *Anderson v. Sternes*, 243 F.3d 1049, 1053 (7th Cir. 2001) ("[S]tate court evidentiary errors do not normally entitle a defendant to habeas relief."). Brophy reasonably concluded that an expert wouldn't have been able to establish that the interaction of alcohol and diabetes impaired M's memory during the encounter with Friar.

Friar contends that an expert still would have been able to impeach the part of M's testimony that "drastically downplay[ed] the effects of alcohol and diabetes." *See* Dkt. 16 at 29. Friar says that Dr. Tovar's testimony would have "exposed" M's "minimization and false claims," including her testimony that: (1) consumption of alcohol normally only leads to a drop in blood sugar several hours after the last drink; (2) alcohol consumption doesn't make it more difficult to monitor blood sugar; (3) a drop in blood sugar only affects memory when at a dangerously low level; and (4) blood sugar level is the only factor in whether a person's memory is impaired by hypoglycemia. *Id.*

I will assume for purposes of this opinion that Brophy's pretrial choice to rely on M herself and Hall to impeach M about the general effects of alcohol and diabetes constitutes deficient performance. It's possible that Brophy should have foreseen that M would have "every incentive to minimize the effects of alcohol and diabetes." *See* Dkt. 16 at 28. It's also possible that Brophy should have known that trying to "back-door" expert testimony on the effects of alcohol and diabetes through a physician's assistant specialized in sexual assault examinations would be unsuccessful. *See id.* I will also assume for purposes of this opinion that the circuit court would have allowed expert testimony to rebut M's testimony downplaying the effects of alcohol and diabetes, even though the expert would not have been able to give an opinion on

13

the specific effects of alcohol and diabetes on M's cognition and memory during the encounter with Friar.

Under de novo review, Friar hasn't shown that Brophy's deficient performance on this matter prejudiced him. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (reviewing de novo the prejudice prong of *Strickland* because the state court didn't reach that issue). The state's "overall case was strong" against Friar. *Friar*, 2020 WI App 76, ¶ 47. "The jury saw video evidence showing that M was not bruised when she entered Friar's apartment but that she was bruised when she exited it a few hours later." *Id.* The jury also "saw photographs from the forensic examination showing that M had sustained bruising to the left and right sides of the neck, the right shoulder area, the collarbone, the upper chest, and the lower back." *Id.* Friar says that M's "neck bruises [came] from [] hickeys," Dkt. 16 at 33, but he hasn't explained what caused the other bruises, *Friar* 2020 WI App 76, ¶ 49. "M's testimony was also corroborated by evidence of her demeanor after the assault, by her texts to her roommates upon regaining consciousness, by her prompt reporting to law enforcement, by her SANE examination, and by her calls to her siblings and parents during that examination." *Friar*, 2020 WI App 76, ¶ 47. Even if some of M's initial statements were inconsistent with her trial testimony, the evidence supported a finding that she was distraught from the encounter and immediately sought help. *See Friar*, 2020 WI App 76, ¶ 48 ("The jury considered evidence from which it could have reasonably inferred that, within hours of the alleged assault, M called two police departments, spent six hours at the hospital submitting to an invasive forensic exam, frantically called every member of her immediate family, and was distraught.").

Friar characterizes his trial as a "credibility contest," Dkt. 16 at 26, but that view of the evidence is too narrow. "[T]he jury considered video footage, photographs, forensic

14

examination reports, police reports, and testimony from many witnesses." *Friar*, 2020 WI App 76, ¶ 48. The jury also "saw evidence showing that M blocked Friar's number and urgently texted her friends for help the moment she escaped Friar's bedroom." *Id.* In addition, the jury saw text messages from Friar to his friends confirming that he "blacked the fuck out," that he "thr[ew] [his] brat in [M]," and that he "just kn[ew] something must have went fucking awful." Dkt. 6-14 at 51, 126, 131. The jury also heard Hall's testimony that "M had sustained injuries to multiple portions of her external genitalia." *Friar*, 2020 WI App 76, ¶ 48. Even though the presence of injuries alone didn't determine the issue of consent, *see* Dkt. 6-13 at 21, there was ample evidence supporting the finding that the encounter wasn't consensual.

The jury had another reason to disbelieve Friar's story. "Friar admitted on the stand to lying about his memory of the night in question, and defense counsel asked the jury to believe that Friar was lying when he repeatedly told his friends he blacked out but that he was telling the jury the truth when he said he had not been very drunk and that he had a perfectly clear memory of the night." *Friar*, 2020 WI App 76, ¶ 49.

Furthermore, Brophy raised the issue of whether diabetes and alcohol affected M's memory even though he didn't have an expert. On cross-examination, M agreed that: (1) alcohol could cause a person to become hypoglycemic; (2) hypoglycemia could affect a person's cognition and memory and cause her to pass out; and (3) she didn't obtain a specific blood sugar reading for the time she was with Friar. Dkt. 6-11 at 9–11. And Brophy argued during his closing that M's alcohol consumption and diabetes affected her memory, caused her confusion, and "contributed to [her] false reporting." Dkt. 6-14 at 248. In view of the strong evidence of Friar's guilt, it's purely speculative to assume that similar, if more detailed,

15

testimony from an expert on this point would have created a reasonable likelihood of a hung jury or an acquittal on the sexual assault charge. Claim 3 lacks merit.

No evidentiary hearing is warranted because, as my analysis shows, "the record . . . precludes habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). I will grant a certificate of appealability because Friar has "demonstrate[d] that reasonable jurists would find [my] assessment of [his *Strickland*] claims debatable." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also* 28 U.S.C. § 2253(c)(2). I will also direct the clerk to seal the parties' submissions that refer to M by her real name.

ORDER

IT IS ORDERED that:

1. Petitioner Nathan J. Friar's habeas petition, Dkt. 1, is DENIED.

2. A certificate of appealability is GRANTED.

3. The following docket entries are to be SEALED: Dkt. 6-9; Dkt. 6-10; Dkt. 6-11; Dkt. 6-12; Dkt. 6-13; Dkt. 6-14; Dkt. 6-15; Dkt. 6-16; Dkt. 13-2; Dkt. 13-4.

4. The clerk of court is directed to enter judgment and close the case.

Entered November 7, 2024.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge